EXHIBIT "1"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUY SNODGRASS                             *
                                          *
     Plaintiff,                   *
                                          *
     v.                           *     Civil Action No: 19-2607
                                          *
DEPARTMENT OF DEFENSE                     *
                                          *
     Defendant.                   *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF GUY SNODGRASS

STATE OF VIRGINIA     )
                          ) ss.:
COUNTY OF FAIRFAX    )

**GUY SNODGRASS,** being duly sworn, deposes and says:

1.   I am a person over eighteen (18) years of age and competent to testify, and I am the Plaintiff in this action. I make this affidavit on personal knowledge and in support of my Application for Order of Preliminary and/or Permanent Injunction.

2.   I served as Director of Communications and Chief Speechwriter to Secretary of Defense James Mattis ("Secretary Mattis") from April 2017 to August 2018. I am a former naval officer and F/A-18 pilot. During my twenty-year career, I served as commanding officer of a fighter squadron based in Japan, speechwriter to the Chief of Naval Operations, TOPGUN instructor, and as a combat pilot over the skies of Iraq. I retired from government service in August 2018. I am currently the CEO of Defense Analytics, a strategic consulting and advisory firm, which I founded after retirement.

3.   I am the author of *Holding the Line: Inside Trump's Pentagon With Secretary Mattis* (Sentinel, 2019)("Manuscript"), which is a memoir of my seventeen months serving with Secretary Mattis. The Manuscript offers a firsthand account of how the Secretary led the U.S.

military through global and domestic challenges. My memoir highlights Secretary Mattis's relationship with President Trump, administration officials, and world leaders. It is well known that Secretary Mattis has said very little about his difficult role. Since his resignation he has kept his views of the President and his policies private, that is, until he recently broke his silence to promote his book. See "Duty, Democracy and the Threat of Tribalism," Wall Street Journal, August 28, 2019, at *https://www.wsj.com/articles/jim-mattis-duty-democracy-and-the-threat-of-tribalism-11566984601*; "In Book, Former Defense Chief Mattis Sideswipes President Trump's Leadership Skills," National Public Radio, August 28, 2019, at *https://www.npr.org /2019/08/28/755018189/in-book-former-defense-chief-mattis-side-swipes-president-trump-s-leadership-ski*.

4.   I drafted this Manuscript to share with readers my own experience of serving in the Pentagon and the other tours of my career. Based on the many months of closely working alongside of Secretary Mattis, my Manuscript reveals how one of the nation's greatest generals walked a political tightrope while leading the world's most powerful military. For example, my Manuscript describes how Secretary Mattis and staff members reacted to various administration and international issues. My Manuscript is the first and only book written by a staff member with personal knowledge of key decisions and moments in history, and serves as a testament to the quiet and steady efforts of Secretary Mattis and the dedicated men and women he led within the Department of Defense.

***DoD's Prepublication Review Process***

5.   Before my Manuscript was submitted to Defendant Department of Defense ("DoD") for classification review, officials there learned of its planned publication. By correspondence dated March 21, 2019, DoD's Office of General Counsel sent me a threatening letter and stated "[i]f

you violate your prepublication review requirement or other legal obligations, the Department

will urge legal action against you and anyone acting in concert with you." The Office of General

Counsel also demanded that I "return all copies of the 'meticulous notes' from your time

working with the Secretary of Defense as well as any other work-related materials still in your

possession." Exhibit "1-A". My legal counsel responded to DoD by letter dated March 28, 2019.

Exhibit "1-B".

6.   I always intended to submit my Manuscript for prepublication review. In fact, I contacted

DoD officials several times in the months prior to confirm exactly what steps I needed to take so

I could follow the rules. These interactions included a December 7, 2018, phone call with a

representative of the Defense Office of Prepublication and Security Review ("DOPSR"), the

office that spearheads classification review, when I coordinated a realistic release date for my

Manuscript. During this call the representative confirmed that as a previous employee, I was only

subject to a classification review. He also confirmed that manuscripts would be reviewed within

30 days in accordance with my Top Secret/Sensitive Compartmentalized Information

nondisclosure agreement, although "sometimes manuscripts can take up to 45 days." During a

February 21, 2019, telephone conversation with the same DOPSR representative, he confirmed

that I could use information from conversations I participated in as long as they are unclassified,

specifically stating that "If it's unclassified, then you can use it. Period."

7.   On March 26, 2019, before the public was alerted to my Manuscript, I informed

Secretary Mattis via e-mail of the forthcoming publication of my book. Secretary Mattis

surprisingly responded "I regret that you appear to be violating the trust that permitted you as a

member of my staff to be in private meetings in my office, where those of us carrying the

responsibilities believed that all could speak openly in pre-decisional discussions." In his e-mail, Secretary Mattis cc'd two members of the DoD's Office of General Counsel. Exhibit "1-C".

8.   On April 26, 2019, I timely and properly submitted my manuscript to DoD for prepublication review. I was specifically instructed by DoD officials to e-mail the Manuscript using unsecure systems, even though the purpose of the prepublication review is to determine whether classified information is contained in the draft. Because I viewed that request to be contrary to appropriate security protocols, I instead hand-delivered my Manuscript to the Pentagon. DoD assigned the review case number 19-SB-0052.

9.   During a May 16, 2019, telephone phone call with DoD, I was informed that my Manuscript would need to undergo a policy review in addition to a classification review. I was not provided any legal justification for this decision. During multiple telephone conversations on June 7, 2019, DoD informed me that the White House, State Department, and the Joint Staff had completed their reviews of my Manuscript. Although the Joint Staff had not identified any classified information in my Manuscript, it was nonetheless taking the position that all conversations in "The Tank", which refers to the Joint Chiefs of Staff Conference Room within the Pentagon, were considered non-attribution and was refusing to allow me to publish any related information. Additionally, DoD stated it would refuse to identify for any of the redactions whether or not the information was classified or being withheld for another reason. Several editorial changes were requested, to include removing all mentions of "The Tank," from the Manuscript. As an act of good faith, I made the requested changes, and resubmitted the updated chapters to DOPSR on June 10, 2019, the next working day.

10. During a June 19, 2019, telephone call with DOPSR, a representative stated that my Manuscript was cleared without redaction by the Office of General Counsel. The representative

stated that only three offices still needed to finish their reviews, and that the Manuscript's review "should be completed in weeks, not months." During a subsequent June 24, 2019, telephone call with DOPSR, my assigned point of contact restated that my Manuscript needed a policy review in addition to a classification review. A meeting was coordinated to discuss face-to-face. On June 27, 2019, I attended a meeting with DoD officials and was informed that additional DoD components, including OSD Policy, would still need to review my Manuscript "for accuracy." Furthermore, I was told that DoD could at any time redact any information without reason nor would it be required to explain why the redacted material was withheld. Additionally, it was reiterated again that I confirm that all mentions of "The Tank" were deleted throughout the Manuscript.

11. Throughout the period June 2019 to the present, I repeatedly conversed with DoD via e-mail, telephone, and in person to address any requested editorial modifications and particularly to submit examples of specific references that had been publicly and officially released regarding information the Joint Chiefs was requiring to be removed, even though the information was confirmed to me to be unclassified.

12. I have great difficulties understanding the Joint Staff's reasoning because it was well-known that numerous manuscripts had been cleared through the DoD prepublication review process containing the same or similar information that I was being required to delete, particularly involving conversations in and descriptions regarding "The Tank." This included, but is not limited to, books authored by former senior high-level DoD officials such as Generals Hugh Shelton and Colin Powell, Admiral Bill McRaven, and Secretaries of Defense Donald Rumsfeld, Robert Gates, Leon Panetta and Ashton Carter.

13. By e-mail dated July 3, 2019, DOPSR notified me that:

> the JS [Joint Staff] judges that deletion of any mention of the Tank does not
> deflect or delink any of the discussions in Chapters 6, 13, and 17 from the JS
> context in a way that avoids attribution.  Accordingly, they do not agree that your
> re-write negates their concerns over the extensive attribution in your 3 chapters.
> They continue to withhold the majority of the material you present in chapters 6,
> 13 and 17.  To boil it down to simplest terms, the prominent quotations of those
> involved in the discussions you provide constitute, in their eyes, explicit
> attribution in a way that does not fulfill their non-attribution policy WRT the
> Tank.  Their position is that the members of the CJCS-and other principles as
> well--need to have absolute confidence that their discussions, to include physical
> reaction and body language, will not be replicated, period.  They insist that the
> explicit attribution, in the form of quotes, be deleted; all instances of CJCS
> members being mentioned as contributing to the discussion(s) be removed; and
> the discussions summarized in a quote-less narrative reflecting current public
> knowledge about the discussions.  They desire that you remove the detailed
> disclosures, note that the meeting occurred, certain subjects were discussed,
> options provided, and decisions made.

Exhibit "1-D".

14. By correspondence dated July 10, 2019, my legal counsel requested DoD to acknowledge by July 17, 2019, that it was not permitted to prevent me from publishing unclassified information, and to also affirm that the concerns asserted by the Joint Staff did not pertain to classified information. Exhibit "1-E".

15. By letter dated July 17, 2019, DoD's Director, Office of Litigation Counsel, asserted that I had a "duty to protect the confidences of Secretary Mattis." It was further claimed "release of such information would violate the public trust placed in Mr. Snodgrass, as Secretary Mattis explained in guidance issued on October 3, 2017 (copy enclosed)." Exhibit "1-F". Ironically, the internal policy guidance that was identified, which fails to impose any legal obligation upon any former DoD official, was primarily authored by me in my capacity as Secretary Mattis's Communications Director.

16. In this same July 17, 2019, letter, it was very clearly written, although denied in a subsequent letter, that the statements at issue regarding "The Tank" were specifically identified as being "unclassified."

17. My attorney, by correspondence dated July 18, 2019, challenged DoD's assertion that a legal obligation existed that pertained to me beyond the protection of classified information. Exhibit "1-G." By correspondence dated July 24, 2019, the DoD Office of General Counsel noted that my "oath of office and personal integrity impart[ed] a special obligation to protect such information regardless of classification." DoD then threatened me by stating "[t]here is a range of potential consequences for violating that oath." The provision cited in the letter, that of SECNAV Inst. 1929.6C, Administrative Separation of Officers, Encl. 6 (Dec. 15, 2005), as amended, includes reduction of an officer's rank during retirement. I do not know how else to take that comment other than a threat that my rank could be reduced if I did not comply with DoD's requirements. Exhibit "1-H". This same letter requested that I arrange for a mid-August meeting with DOPSR, stating, "Because all components will have completed their review by then, the discussion could center on particular unclassified passages that, if published, would constitute a breach of trust."

18. My legal counsel notified DoD in a letter dated August 7, 2019, that in another recent prepublication review case (Edgar v. Coats, D.Md), the Department of Justice in its representation of the same Defendant argued that DoD could only prohibit publication of classified information. Exhibit "1-I". In our letter, we also requested a meeting to occur no later than August 16, 2019, so that final discussions could occur. Despite repeated requests, the meeting never happened.

19. By telephone conversation on August 15, 2019, the Director, DOPSR, stated that the review of my Manuscript was completed. The Director requested that I "trust him," stating that he had successfully resolved the dispute with the Joint Staff in my favor but that he needed a few more days to complete the process and my clearance letter. Then, on August 20, 2019, I was informed by Director, DOPSR, that I should receive a final clearance letter "by the end of the day, or tomorrow morning at the latest." But by telephone conversation and e-mail dated August 23, 2019, the Director, DOPSR, then informed me that he had been told to withhold my manuscript's clearance, stating that "senior leaders have directed my office to hold our response pending the outcome of high-level discussions." Exhibit "1-J".

20. By correspondence dated August 22, 2019, DoD's Office of General Counsel threatened me again when it regurgitated the request from its original letter of March 21, 2019, and demanded return of any official government records that might still be in my possession. Exhibit "1-K". My legal counsel accurately responded by correspondence dated August 26, 2019, that I have no records that need to be returned. Exhibit "1-L". At the same time, we requested an explanation by August 28, 2019, as to why senior DoD officials had instructed DOPSR to withhold approval of my Manuscript. No response was ever received.

21. I have specifically been told by DoD officials, including from within DOPSR, that not one word in my Manuscript has been identified as classified. Only editorial changes have been requested by DoD, and I have strived to cooperate wherever possible. But I am not obligated to redact or change any text that is not classified.

22. The DoD has deliberately delayed issuing formal and final approval of my Manuscript as a retaliatory and punishing tactic, particularly with the consent and apparent approval of Secretary Mattis. Indeed, numerous sources from within DoD have stated to me that final

approval was intentionally withheld in order to allow Secretary Mattis's book to be published first. By e-mail dated July 28, 2019, Secretary of Defense Mark Esper's Chief of Staff confirmed that Secretary Mattis's Deputy Chief of Staff, who still resides in Secretary Esper's office, "is working this" for the current Secretary of Defense, proving high-level awareness and engagement within DoD. Exhibit "1-M". Overall, these tactics have succeeded, and I understand that Secretary Mattis's book hypocritically contains his recollection of private and official conversations with the political and military leadership of the United States, to include the President, ostensibly in violation of the very loyalty and trust he sought to impose upon me.

23. DoD's actions have constructively imposed an injunction upon me that prohibits the publication of my Manuscript. It is my understanding that if I proceeded to publication without formal written DoD authorization, I would be on a legally perilous path and that I could be sued civilly for breach of contract. Indeed, DoD's Office of General Counsel threatened that in the first letter to me on March 21, 2019. I have no desire to defend against any such lawsuit. More importantly, I believe strongly in my lifelong responsibility to preserve the special trust and confidence placed in me to protect classified information. Having served in uniform for a quarter-century, I understand the importance of national security and would willingly redact any properly classified information. But to date, not one word in my Manuscript has been identified as classified. Despite completion of my Manuscript's security review by external agencies on June 7, 2019, and completion of DoD's internal review on or before August 15, 2019, a final decision has been deliberately withheld. I had no recourse other than legal action to compel the release of my Manuscript's clearance letter.

24. Based on DoD's deliberate actions to prohibit the publication of my Manuscript, the planned publication date of October 29, 2019, will need to be pushed back. Every delay of

publication causes me financial and possible reputational harm. If my Manuscript cannot be

published before Thanksgiving, it is my understanding publication will then have to wait until

after the 2019 holidays for meaningful retail placement. My publisher has stated that if we are

not able to publish by January 2020, my Manuscript's value will be materially, significantly and

irreparably diminished since the contents will be more in the past (and other books might have

been published by then) and would be overwhelmed by the 2020 political elections as well.

Dated: September 3, 2019

_____
Guy Snodgrass

Sworn to before me this
3rd day of September 2019.

_____
Notary Public

Fairfax County, Virginia

DANIEL PATRICK KANE
NOTARY PUBLIC
REGISTRATION # 103895
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
APRIL 30, 2021

10